**No. 25-11210**

# In the United States Court of Appeals for the Fifth Circuit

ASHLEY CULLEY,
*Plaintiff- Appellee,*

*v.*

JEFF LYDE AND KENNY NASH,
*Defendants-Appellants*

On Appeal from the United States District Court
for the Northern District of Texas, Wichita Falls Division

## BRIEF OF APPELLANT JEFF LYDE

THOMAS P. BRANDT
State Bar No.02883500
tbrandt@fhmbk.com
JOHN D. HUSTED
State Bar No. 24059988
jhusted@fhmbk.com
THOMPSON, COE, COUSINS, & IRONS, L.L.P.
700 North Pearl Street, 25th Floor
Dallas, Texas 75201
Telephone: 214-871-8200
Fax: 214-871-8209

Counsel for Defendant-Appellant Jeff Lyde

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

| **Defendant-Appellant**: | **Counsel** |
| --- | --- |
| Jeff Lyde | Thomas P. Brandt<br>John D. Husted |
| **Plaintiff-Appellee**: | **Counsel** |
| Ashley Culley | James P. Roberts |
| **Defendant - Appellant**: | **Counsel** |
| Kenny Nash | Christopher A. Klement |

/s/ *Thomas P. Brandt*
**THOMAS P. BRANDT**
**Attorney of Record for Defendant-Appellant Jeff Lyde**

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument as he believes it could significantly aid the decisional process in this case.

# TABLE OF CONTENTS

Certificate of Interested Persons ........................................................................ ii

Statement Regarding Oral Argument ................................................................... iii

Table of Contents .................................................................................................. iv

Table of Authorities ............................................................................................... vi

Jurisdictional Statement ..........................................................................................1

Issues Presented .......................................................................................................1

Statement of the Case ..............................................................................................2

1. Culley's Allegations ........................................................................2

2. Procedural History ............................................................................3

3. The Summary Judgment Facts ...........................................................5

Summary of the Argument ....................................................................................15

Arguments and Authorities ...................................................................................17

A. Standard of Review ...............................................................................17

1. Motion for Summary Judgment when Qualified Immunity is at Issue. ....................................................................................17

2. The Qualified Immunity Standard ....................................................19

3. Fourth Amendment Claims. .............................................................22

4. To determine whether a right was clearly established, the Court must evaluate whether the alleged conduct was proscribed by "clearly established law" at the time of the incident ..........................24

B. The District Court Erred by Finding Lyde's Conduct Was Objectively Unreasonable Under Clearly Established Law. ..........................................25

1. The Supreme Court's holding in *Franks v. Delaware* is limited to the criminal context and did not clearly establish a civil cause of action ........ 26

2. Under the Fifth Circuit's case law, it was not beyond debate that Lyde's conduct violated clearly established law. ........ 30

3. The District Court's Reliance on *Terwilliger* and *Guerra* is misplaced. ........ 34

C. The District Court Erred Regarding Its Materiality Determinations ........ 38

1. The District Court Incorrectly Ignored the Material Fact that Nash and Lyde Had Learned that Eight to Twelve Computers Already Had Access To and Contained CJIS Data. ........ 40

2. The District Court Erred by Concluding that Nash Had Knowledge of Sims' February 8 Email Based on No Facts, but only an Unreasonable, Unsupported Inference. ........ 43

3. The District Court Misconstrued the Materiality of Nash's Affidavit's silence regarding Sims' February 8, 2021 Email, Because Sims Lacked Knowledge of the 8 to 10 Computers Accessing CJIS Data Which Culley Left Off of the 2019 Network Map. ........ 46

4. The District Court Incorrectly Ignored Nash's Belief that Culley Excluded Wichita County "End of Life" Computers from 2019 Network Diagram. ........ 49

5. The District Court's Finding of a Factual Dispute Regarding "Motive" Was Not Material. ........ 52

6. The District Court erroneously concluded that a jury could find that the investigation was fraudulent based on the immaterial fact that there was a change in network maps. ........ 53

Conclusion ........ 53

Certificate of Service ........ 55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amador v. Vasquez*,
961 F.3d 721 (5th Cir. 2020) ....................1, 19

*Anderson v. Creighton*,
483 U.S. 635 (1987) ....................21

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) ....................20, 24

*Bailey v. Iles*,
87 F.4th 275 (5th Cir. 2023) ....................30

*Blake v. Lambert*,
921 F.3d 215 (5th Cir. 2019) ....................39

*Brown v. Callahan*,
623 F.3d 249 (5th Cir. 2010) ....................17

*Brumfield v. Hollins*,
551 F.3d 322 (5th Cir. 2008) ....................19

*City of Escondido v. Emmons*,
586 U.S. 38 (2019) ....................20, 29

*Club Retro, LLC v. Hilton*,
568 F.3d 181 (5th Cir. 2009) ....................22

*Cole v. Carson*,
935 F.3d 444 (5th Cir. 2019) ....................19, 30, 39

*Cunningham v. Castloo*,
983 F.3d 185 (5th Cir. 2020) ....................18, 19, 20, 21

*Davis v. Hodgkiss*,
11 F.4th 329 (5th Cir. 2021) ....................17

*District of Columbia v. Wesby*,
583 U.S. 48 (2018) ....................*passim*

*Edmiston v. Borrego*,
75 F.4th 551 (5th Cir. 2023) .......................................................................20

*Favela v. Collier*,
91 F.4th 1210 (5th Cir. 2011) .....................................................................45

*Fernandez v. California*,
571 U.S. 292 (2014)...................................................................................28

*Franks v. Delaware*,
438 U.S. 154 (1978)...........................................................................*passim*

*Galindo v. Precision Am. Corp.*,
754 F.2d 1212 (5th Cir. 1985) ...............................................................35, 38

*Garza v. Briones*,
943 F.3d 740 (5th Cir. 2019) .......................................................................18

*Guerra v. Castillo*,
82 F.4th 278 (5th Cir. 2023) ...................................................................*passim*

*Hope v. Pelzer*,
536 U.S. 730 (2002)...................................................................................24

*Kokesh v. Curlee*,
14 F.4th 382 (5th Cir. 2021) .......................................................................18

*Little v. Liquid Air Corp.*,
37 F. 3d 1069 (5th Cir. 1994) ..........................................................35, 38, 39

*Malley v. Briggs*,
475 U.S. 335 (1986).............................................................................21, 39

*McMurry v. Brunner*,
No. 21-50888, 2022 WL 17493708 (5th Cir. Dec. 7, 2022) ..............................29

*Melton v. Phillips*,
875 F.3d 256 (5th Cir. 2017) ..................................................................*passim*

*Mitchell v. Forsyth*,
472 U.S. 511 (1985).............................................................................17, 21

*Morgan v. Swanson*,
659 F.3d 359 (5th Cir. 2011) ....................19, 22

*Mullenix v. Luna*,
577 U.S. 7 (2015)....................20

*Nerio v. Evans*,
974 F.3d 571 (5th Cir. 2020) ....................24, 29

*Nieves v. Bartlett*,
587 U.S. 391 (2019)....................52

*Pasco ex rel. Pasco v. Knoblauch*,
566 F.3d 572 (5th Cir. 2009) ....................38

*Pearson v. Callahan*,
555 U.S. 223 (2009)....................19, 20

*Perniciaro v. Lea*,
901 F.3d 241 (5th Cir. 2018) ....................1

*Pierce v. Smith*,
117 F.3d 866 (5th Cir. 1997) ....................22

*Reichle v. Howards*,
566 U.S. 658 (2012)....................28

*Rivas-Villegas v. Cortesluna*,
595 U.S. 1 (2021) (per curiam)....................29

*Roque v. Harvel*,
993 F.3d 325 (5th Cir. 2021) ....................26

*Scott v. Harris*,
550 U.S. 372 (2007)....................20

*Shumpert v. City of Tupelo*,
905 F.3d 310 (5th Cir. 2018) ....................30

*Spikes v. Wheat*,
141 F.4th 662 (5th Cir. 2025) ....................18, 39

*Terwilliger v. Reyna*,
4 F.4th 270 (5th Cir. 2021) ........................................................................*passim*

*United States v. Leon*,
468 U.S. 897 (1984)........................................................................................28

*United States v. Tomblin*,
46 F.3d 1369 (5th Cir. 1995) ...................................................................35, 46, 49

*United States v. Wilson*,
273 Fed. Appx. 356 (5th Cir. 2008)...............................................................52

*Villarreal v. City of Laredo*,
94 F.4th 374 (5th Cir. 2024) (en banc) ...........................................................23

*Vincent v. City of Sulphur*,
805 F.3d 543 (5th Cir. 2015) ..........................................................................21

*White v. Pauly*,
580 U.S. 73 (2017)...........................................................................................21

*Winfrey v. Rogers*,
901 F.3d 483 (5th Cir. 2018) ........................................................19, 22, 38, 39

**Constitutions**

U.S. CONST. Amendment IV..........................................................................*passim*

**Statutes**

28 U.S.C. § 1291..................................................................................................1

Tex. Penal Code § 37.10 ..................................................................................*passim*

Fed. R. Civ. P. 56 ......................................................................................38, 45

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because it is an interlocutory appeal of an order that denied the Individual Defendants'[1] motions for summary judgment in which they asserted qualified immunity, and the appeal does not rest on the basis of the existence of genuine issues of material fact.[2]

The Individual Defendants Lyde and Nash timely appealed by filing their notice of appeal on October 29, 2025, which was within thirty days of the District Court's September 30, 2025 order. *See* ROA.1373, 1391.

## ISSUES PRESENTED

1. Whether the Supreme Court has ever established that a criminal defendant has a clearly established right to a civil cause of action for an alleged violation of *Franks v. Delaware* against the affiant officer, or in Defendant-Appellant Sheriff Lyde's case, against an officer who allegedly directed a subordinate officer to create and execute an arrest warrant affidavit.

---

[1] The Individual Defendants are the Appellants.

[2] *Perniciaro v. Lea*, 901 F.3d 241, 250 (5th Cir. 2018); *Amador v. Vasquez*, 961 F.3d 721, 726 (5th Cir. 2020).

2. Is Defendant-Appellant Sheriff Lyde entitled to qualified immunity because he did not commit a Fourth Amendment constitutional violation under *Franks v. Delaware*.

3. Is Defendant-Appellant Sheriff Lyde entitled to qualified immunity because he did not violate a constitutional right which was clearly established under the Fourth Amendment or *Franks v. Delaware*.

4. Assuming, *arguendo*, that Fifth Circuit case law is sufficient to satisfy the clearly established law prong of the qualified immunity analysis, is Defendant-Appellant Sheriff Lyde still entitled to qualified immunity from Plaintiff-Appellee Culley's Fourth Amendment false arrest claim under *Franks v. Delaware*, where no existing case law placed it beyond debate that Lyde's actions constituted a *Franks* violation, and where Lyde was not involved in the creation or submission of the arrest affidavit, but allegedly directed Nash to create the affidavit.

5. Did the District Court improperly deny qualified immunity based on fact issues that are not material?

## STATEMENT OF THE CASE

### 1. Culley's Allegations

Appellee-Plaintiff Ashley Culley ("Appellee" or "Culley"), a former contract IT professional at the Clay County Sheriff's Office ("CCSO" or "Sheriff's Office"), brings a Fourth Amendment false arrest claim under *Franks v. Delaware*, against

Defendant-Appellant former Clay County Sheriff Jeff Lyde ("Lyde"), co-Defendant-Appellant former Clay County investigator Sergeant Kenny Nash ("Nash"), and Defendant Clay County.

Culley alleges that Lyde and Nash wanted her fired because she was gay. Culley alleges that Lyde directed Nash to create a warrant affidavit containing material falsehoods in order to arrest Culley for a violation of Tex. Penal Code §37.10 - tampering with government records.

Culley admits that in 2016 and 2019, before Lyde became Sheriff, she created government documents known as network diagrams which were submitted to the Texas Department of Safety ("DPS") in order to gain CJIS compliance, and that these network diagrams showed that, at the time, the CCSO had only one computer which accessed CJIS data. Despite Culley's misrepresentation to DPS, eight to twelve computers had actually been accessing and storing CJIS data at those times.

**2. Procedural History**

On September 30, 2022, Plaintiff-Appellee Culley filed her Original Complaint alleging a *Franks* claim against Lyde, Nash, and Clay County. ROA.13. Before it was answered, Culley filed her First Amended Complaint on November 16, 2022. ROA.86.

On December 30, 2022, all three Defendants filed their respective Motions to Dismiss. ROA.172; ROA.311; ROA.338. The Motions to Dismiss were fully

briefed. On September 1, 2023, the Court granted Defendants' Motions to Dismiss, without prejudice to Plaintiff amending her Complaint. ROA.501. On September 11, 2023, the Court entered a Notice indicating that Plaintiff was granted leave to amend her complaint considering the holdings of the Fifth Circuit's September 7, 2023 decision in *Guerra v. Castillo*.[3] ROA.523.

On October 12, 2023, Culley filed her Second Amended Complaint, which added a formulaic recitation of the *Guerra* case. ROA.524. All three Defendants again moved to dismiss. ROA.620; ROA.652; ROA.665.

On May 21, 2024, the court entered its order denying the motions to dismiss as to Plaintiff's false arrest claims against Nash and Lyde, granting dismissal of Plaintiff's conspiracy claims, and denying the County's motion to dismiss the municipal liability claim. ROA.796.

On June 11, 2024, the Defendants timely filed their respective Answers. ROA.824; ROA.880; ROA.937. The court entered a Scheduling Order providing for limited discovery for purposes of adjudicating Nash and Lyde's qualified immunity defense by way of Motions for Summary Judgment. ROA.1008. Some qualified immunity paper discovery was exchanged, but Plaintiff did not seek any depositions.

On April 18, 2025, Lyde and Nash filed their respective qualified immunity Motions for Summary Judgment, with briefs and evidence in support. ROA.1030 –

---

[3] *Guerra v. Castillo*, 82 F.4th 278 (5th Cir. 2023).

ROA.1139. The Motions were fully briefed. ROA.1145 (Plaintiff's Response); ROA.1326-1335 (Nash's Reply); ROA.1336-1339 (Defendants' Objections); ROA.1340-1358 (Lyde's Reply); ROA.1359 (Plaintiff's Response to Objections); ROA.1367-1372 (Defendants' Reply on Objections).

On September 30, 2025, the District Court entered its Order denying Lyde and Nash's Motions for Summary Judgment asserting qualified immunity. ROA.1388. Lyde and Nash now bring this interlocutory appeal, appealing the denial of their assertion of qualified immunity. ROA.1391.

### 3. <u>The Summary Judgment Facts</u>[4]

#### a. Culley

Since 2009, Culley worked on a contract basis as the IT administrator for Clay County, while she was at the same time a full-time Assistant Director of IT for Wichita County. ROA.1374; ROA.1248.

#### b. Sheriff Lyde

Lyde was elected Clay County Sheriff and began serving as Sheriff in November of 2020. ROA.1067.

#### c. The Clay County Sheriff's Office, the DPS, TLETS, and CJIS

The Clay County Sheriff's Office ("CCSO") depends on access to the Texas Law Enforcement Telecommunications ("TLETS") network and database. The

[4] This statement of facts is based on the District Court's findings and uncontroverted summary judgment evidence.

CCSO must comply with the Texas Department of Public Safety's ("DPS") requirements for the use of Criminal Justice Information Services ("CJIS") to access TLETS, including various requirements and restrictions to protect sensitive data and to defend against unauthorized access. ROA.1067-68, ROA.1249.

**d. Before Sheriff Lyde's Election**

Prior to Lyde's election, Culley was responsible for coordinating with DPS and obtaining their approval of how CCSO would comply with DPS requirements for accessing CJIS information. ROA.1248. To ensure DPS approval, Culley was in contact with DPS CJIS Technical Auditor Linda Sims throughout her time with Clay County. ROA.1249.

**e. CJIS Compliance Requirement of Submitting Network Map**

CJIS compliance required submitting to DPS a government document referred to as a network map or diagram. ROA.1249. The network map showed the Clay County computer setup, including which computers had access to CJIS information. After reviewing the network map, DPS would then approve it. ROA.1249.

**f. Culley's Maps**

Culley created and submitted to DPS the CCSO's network maps during 2016 and 2019 audits of the County by DPS. ROA.1249-50. The maps she submitted showed that there was only <u>one</u> computer at the CCSO accessing CJIS information at those times. ROA.1250.

### g. Sheriff Lyde's Plan to Upgrade Technology and the Hiring of Lanny Evans

Prior to Sheriff Lyde taking office, the Sheriff's Office did not utilize Mobile Data Terminals ("MDTs"), such as laptops, to access CJIS-protected TLETS data. ROA.1250.

Shortly after becoming Sheriff, Lyde hired Lanny Evans to serve as Captain and to principally work on IT issues, including the installation of MDTs. ROA.1067-68. Lyde also decided to have the CCSO transition to using new software (COPsync and Kologik) in order to access TLETS on MDTs. ROA.1251. The Sheriff's plan included being compliant with CJIS requirements and obtaining DPS approval. ROA.1122-23. As part of the transition process under Sheriff Lyde, including using new software, the CCSO did not add any new CJIS access to any computers in the CCSO headquarters. ROA.1123.

### h. Captain Evans Takes the Lead; Submits a New Map

Lyde appointed Captain Evans to lead the transition project. ROA.1122, 1253. One of Captain Evans' tasks was to develop a network map to submit to the DPS for CJIS certification, as Culley had previously done. ROA.1122-23. In developing the new network site map, Captain Evans discovered that eight to ten computers inside the CCSO headquarters were accessing and storing CJIS data. ROA.1069, 1076. The network map that Evans submitted to DPS showed that these existing computers

inside CCSO headquarters accessed CJIS information, and it also added another proposed 12-13 MTDs for CCSO vehicles. ROA.1069.

#### i. DPS Responds: "You are out of compliance."

In response to the submission of the new network map by Captain Evans, DPS notified CCSO that the new network site map was not in compliance with CJIS requirements. ROA.1069, 1075. Specifically, DPS auditor Linda Sims was confused as to the additional desktop computers being added inside the CCSO headquarters. ROA.1069.

#### j. Lyde and Evans Learn that Culley's Maps Were Wrong.

Lyde and Evans were also confused because they were not adding CJIS access to any computers inside the CCSO, but only showing what computers already had access. ROA.1069. Thus, Lyde learned that the prior CCSO network maps submitted to DPS auditor Sims by Culley showed that only <u>one</u> computer inside the CCSO had access to CJIS information, when in reality, multiple computers were accessing CJIS information at that time. ROA.1069, 1076.

#### k. Sheriff Lyde Directed Nash to Investigate

Based on the discrepancies in number of computers accessing CJIS data, Sheriff Lyde decided that an investigation should be opened. ROA.1069.

In January of 2021, Sheriff Lyde instructed investigator Sergeant Kenny Nash to investigate Culley's preparation of the network maps submitted as part of the 2016 and 2019 DPS audits. ROA.1069-70, 1075, 1375. Nash investigated whether Culley

accurately reported the number of computers with access to CJIS on the 2016 and 2019 network maps. ROA.1075-77. At the time, Nash was the sole Investigator for the CCSO and had over a decade of experience in conducting investigations. ROA.1069-70, 1074-75. Lyde was aware that Nash's investigation was underway, but he did not participate in the investigation. ROA.1070-71, 1076-77.

**l. CCSO Continued to Work with DPS**

In an email dated January 22, 2021, DPS auditor Sims told County personnel, including Lyde and Evans, that in their current configuration, adding existing CCSO computers would put CCSO out of CJIS compliance, so updating the County's system's protections, such as separating the Sheriff's Office computers from the rest of the County's network, would be necessary. ROA.1254.

**m. Lyde's Efforts to Meet the DPS Requirements**

Sheriff Lyde then sent an email to multiple people, including Captain Evans and Culley, indicating that the Sheriff's Office needed to separate from the rest of the network to gain CJIS compliance. ROA.1375. In response, Culley emailed Lyde that changing the network configuration to add Kologik and COPsync so MDTs could be utilized would take Clay County out of CJIS compliance with DPS. ROA.1375, 1255. In this same email Culley stated, "Sir, we are CJIS compliant and have passed every year. Sims has received all network maps and passed us since I have been with Clay county [sic]…Currently TLETS has always been a stand alone

network and never been part of the clay county [sic] network." ROA.1255. Culley claimed that changing the configuration "takes us out of compliance." ROA.1255.

Captain Evans responded to Culley's email stating, in relevant part:

> Actually, the current plan does not change the way we connect to TLETS. It will still be stand-alone. The issue, according to DPS, is that our desktop computers are on the County network and the local server contains data obtained from TLETS. Apparently, DPS sees it as an issue even when the data is cloud based.

ROA.1255 (emphasis added).

### n. Nash Continued His Investigation and Made His Findings

During Nash's investigation, he "spoke with CCSO deputies who were employed by CCSO in 2016 and 2019. Those deputies informed me that multiple CCSO computers in 2016 and 2019 contained and were used to access to CJIS data." ROA.1117 (emphasis added). It was not disputed that Nash was thus informed by other deputies.

Nash testified that Captain Evans told him that "the 2016 and 2019 network site maps were inaccurate with regard to the computers with access to CJIS data." ROA. 1117.

Nash testified that he "found that Plaintiff indicated on the 2019 network site map that only one CCSO computer had access to CJIS data, but up to 10 to 12 other computers had access to or contained CJIS data in 2019." ROA.1119.

**o. Nash Spoke with DPS Auditor Sims**

As part of his investigation, Nash spoke with DPS CJIS auditor Sims. ROA.1076. She informed Nash that the 2019 network site map only reflected one computer that contained CJIS data. ROA.1076. Sims further stated that Culley drew the 2019 network site map and is the person responsible for submitting it for the audit. ROA.1076.

**p. Nash Learned that Culley Used "End of Life" Computers**

During his investigation, Nash learned that Culley had used "end of life"[5] computers from Wichita Falls Sheriff's Office, Culley's other employer, at the CCSO. ROA. 1106; ROA. 1117. When CCSO users started the server, the Wichita County seal would appear on computer screens. ROA.1072. Wichita County even came to the CCSO and took back all of the property Culley had misappropriated. ROA.1072.

Sims informed Nash that if an agency used "end of life" computers, it would not pass CJIS requirements. "Sims stated that submitting a network diagram which contained 'end of life equipment' would cause an agency not to pass the audit." Nash testified that "Sims stated that a reason someone could intentionally leave these end of life items off of the map is due to the fact that they would know they would not pass the audit if they were listed." ROA.1078, 1246.

[5] "End of life' equipment refers to computers which are old and at or near the end of their life-cycle as a reliable tool and that no longer receive security updates from the manufacturer.

**q. Culley did not identify the "end of life" equipment on her maps**

Culley admits that she used equipment that was previously used at Wichita County. ROA.1265.

Culley admits that she did not identify this Wichita County "end of life" equipment on the network diagrams submitted to DPS. ROA.1263.

**r. Sims' February 8 Email Was Not Sent to Nash**

On February 8, 2021, DPS auditor Sims wrote an email with a subject line of "Network Configuration," which was sent to Sheriff Lyde with Captain Evans and Culley copied. ROA.537, 1274. Sims' February 8 email states in relevant part:

> I would like to go on record and say that I was asked how did the agency past their previous audit. This is in reference to the 10 or 12 desktops that were not on the previous network diagram. The 10 or 12 desktops were never discuss [sic] in the previous audits **because I was informed that they did not have access to CJI data**.
> …
> I have attached a copy of the agency's 2016 and 2019 CJIS Technical Audits. Please see the agency's answers that addresses the statements about the JIMS. If the 10 or 12 desktops do not have access to TLETS computer or the JIMS then they would not have been added to the network diagram.[6]
> The reason why the 10 or 12 desktops must be included on the **current** diagram is because the agency is going to have CJI data on the PD network. The 10 or 12 desktops **are going to have access** to the Kologik CAD/RMS/JMS. The 10 or 12 desktops will be used to access, process or store CJI data into those system.
> …
> Those desktops were not include [sic] on the diagrams before because they did not have access to CJI data **per your agency**.

[6] Sims confirms that her understanding of the network is based on information that was provided to DPS by "the agency," (CCSO), i.e., by Culley's network maps.

ROA.1274 (emphasis added).[7] The email and its contents were not shared with Nash by Lyde, Sims, Evans, Culley, or anyone else. ROA.1070-71, 1076. Nash did not intentionally omit any of the statements made by Sims in her February 8, 2021 email because he did not receive the email and no one conveyed her statements to him prior to Plaintiff's arrest. ROA.1076.

**s. Sheriff Lyde's email: "How goes the war today?"**

On February 11, 2021, Lyde sent an email to the Wichita County Sheriff with a subject title of "Culley," stating in full, "How goes the war today?" ROA.1375.

**t. Sheriff Lyde Responds to Sims**

On March 4, 2021, Lyde responded to an email from DPS auditor Sims asking why she (Sims) received a call from Nash, by telling her (Sims) that Nash was calling her because of a criminal investigation into Culley. ROA.1376.

**u. Culley Did Not Speak to Nash.**

During his investigation, Nash attempted to interview Plaintiff. ROA.1077. However, she refused to be interviewed and did not otherwise provide him with a statement. ROA.1077.

---

[7] On its face, Sims' February 8 email did not mention "end of life" equipment. Bizarrely, the District Court said that Sims' February 8 email "explain[ed] the end-of-life equipment issue," and that "the unnatural language of Nash's final affidavit suggests he knew of email's content because [Nash's affidavit] avoided mentioning end-of-life equipment directly." ROA.1382.

**v. Nash's Conclusion: Probable Cause Exists**

At the conclusion of his investigation, Nash reasonably believed that probable cause existed that Culley violated Texas Penal Code § 37.10 (Tampering with Governmental Record) by knowingly making a false entry on the 2019 network site map which had been submitted to DPS during a DPS audit. Nash concluded that the submission made the map a government record. Nash concluded that Culley had submitted the network map with knowledge of its falsity and with intent that it be taken as a genuine government record. ROA.1077.

**w. Nash's Probable Cause Affidavit**

On March 22, 2021, Nash drafted and executed his Affidavit for Warrant of Arrest and Detention, testifying that he had probable cause to believe Culley committed the offense of Texas Penal Code §37.10 (Tampering with Governmental Record) when she issued the network map on or about June 3, 2019. ROA.1077, 1244-1246,1376.

**x. Sheriff Lyde Did Not Participate in the Creation, Signing, or Presentment of Nash's Affidavit.**

Lyde did not draft the Affidavit. ROA.1379. Lyde did not direct Nash's investigation, nor suggest any outcome. ROA.1070-71, 1077. Lyde did not direct Nash to arrest Culley or create the warrant affidavit. ROA.1070-71, 1077. Lyde did not direct Nash to include or omit any information from the warrant affidavit or

otherwise assist in its preparation in any way. ROA.1070-71, 1077-79. Lyde did not see the affidavit before Nash submitted it to the magistrate. ROA.1071.

**y. The District Court's Misunderstanding**

The District Court denied Lyde's summary judgment motion based on the conclusion that Lyde knew why the network maps changed, because he was a part of various emails during the network changeover process. ROA.1381. The offense that made the basis of Nash's Affidavit, however, was not for a change in the network maps. Rather, the offense was Culley's submission of network maps in 2016 and 2019 which showed that only one CCSO computer accessed CJIS data, when, in actuality, multiple CCSO computers in 2016 and 2019 were used to access CJIS data. ROA.1117, 1075-78.

**z. Culley Arrested.**

Culley was arrested on March 25, 2021. ROA.1265.

**aa.Culley's Criminal Case Was Dismissed.**

After Culley's defense attorney filed a motion to dismiss the criminal case for failure to move forward, Culley's criminal case was dismissed on October 6, 2021. ROA.1265.

## SUMMARY OF THE ARGUMENT

This Court should reverse the district court's order denying Sheriff Lyde's motion for summary judgment because he is entitled to qualified immunity from Culley's *Franks* claim. The district court erred in finding that Sheriff Lyde's alleged

conduct violated clearly established law. The Supreme Court's holding in *Franks v. Delaware* is limited to the criminal context and did not clearly establish a civil cause of action, and no subsequent Supreme Court decision has ever recognized a civil cause of action under *Franks*.

Assuming, *arguendo*, that this Court can establish such a civil cause of action and that this Court's cases satisfy the clearly established prong of the qualified immunity analysis, Lyde is still entitled to qualified immunity.

Lyde instructed Nash to investigate, but did not participate in the investigation. Lyde did not draft the warrant affidavit. Lyde did not instruct Nash what to put in the affidavit. Lyde did not contribute to the affidavit. Lyde did not see the affidavit before Nash submitted it to the magistrate. Nash drafted the warrant affidavit on his own. There is no evidence that he knew whether it contained or omitted material falsehoods.

Regardless, the affidavit did not contain material falsehoods, let alone falsehoods inserted with knowledge or a reckless disregard for the truth. Instead, the warrant affidavit accurately set forth Nash's reasonable belief that probable cause existed. The district court incorrectly concluded, based on no competent summary judgment evidence, that Nash had knowledge of a certain email. The district court also incorrectly assumed that an email was exculpatory, when, on its face, it was not,

and when there was no summary judgment evidence to establish that it was exculpatory under any theory.

Taking the summary judgment evidence in the light most favorable to the plaintiff, it was not "beyond debate" that Lyde's alleged conduct under the circumstances violated clearly established law that existed at the time.

## ARGUMENTS AND AUTHORITIES

### A. Standard of Review

#### 1. Motion for Summary Judgment when Qualified Immunity is at Issue.

A district court's denial of an officer's motion for summary judgment based on qualified immunity is immediately appealable under the collateral-order doctrine to the extent it turned on an issue of law.[8] "Whether an official's conduct was objectively reasonable [in light of the law that was clearly established at the time of the disputed action] is a question of law for the court, not a matter of fact for the jury."[9] This does not mean, however, that there can never be a fact question involved in the analysis. If historical facts are in dispute and those facts effect the legal determination of what the clearly established law is that applies to a given case, then a fact-finder (such as a jury) may be needed to first determine what the underlying historical facts are to which the law can then be applied. Although nominally an

---

[8] *Mitchell v. Forsyth*, 472 U.S. 511, 528–30 (1985); *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017).

[9] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010); *Davis v. Hodgkiss*, 11 F.4th 329, 332 (5th Cir. 2021).

affirmative defense, the plaintiff has the burden to negate the defense of qualified immunity once it is properly raised.[10] The plaintiff has the burden to point out clearly established law and of raising a fact issue as to its violation.[11]

If the summary judgment denial was because of genuine issues of material fact, this Court has jurisdiction to determine the materiality of the factual disputes.[12] That is, even if the district court said that, in its view, material factual disputes preclude summary judgment, this Court can still decide whether the factual disputes were actually material to the application of qualified immunity.[13]

This Court applies the materiality analysis to both questions that arise when an official invokes qualified immunity: (1) whether the defendant violated the plaintiff's constitutional or statutory rights; and (2) whether those rights were clearly established at the time of the violation "such that the officer was on notice of the unlawfulness of his or her conduct."[14]

On review, this Court determines whether the district court correctly assessed "the legal significance of the facts it deemed sufficiently supported for purposes of summary judgment."[15] The Court views the facts and draws reasonable inferences

---

[10] *Garza v. Briones*, 943 F.3d 740, 744 (5th Cir. 2019).
[11] *Kokesh v. Curlee*, 14 F.4th 382, 392 (5th Cir. 2021).
[12] *Melton*, 875 F.3d at 261.
[13] *Spikes v. Wheat*, 141 F.4th 662, 667 (5th Cir. 2025) (quoting *Kovacic v. Villarreal*, 628 F.3d 209, 211 n.1 (5th Cir. 2010)); *Cunningham v. Castloo*, 983 F.3d 185, 190 (5th Cir. 2020).
[14] *Kokesh*, 14 F.4th at 391–92.
[15] *Spikes*, 141 F.4th at 667.

in the light most favorable to the plaintiff and asks whether the defendant would be entitled to qualified immunity on those facts.[16]

"The 'scope of clearly established law and the objective reasonableness of those acts of the defendant that the district court found the plaintiff could prove at trial are legal issues we review *de novo*.'"[17] This Court reviews "legal conclusions, materiality determinations, and the scope of clearly established law *de novo*."[18] Additionally, "[t]his Court reviews the district court's probable-cause determination *de novo*."[19]

**2. The Qualified Immunity Standard.**

"Qualified immunity is an immunity from suit rather than a mere defense to liability."[20] A plaintiff seeking to defeat qualified immunity must show: (1) that the official violated a statutory or constitutional right; and (2) that the right was clearly established at the time of the challenged conduct, such that the official's actions were objectively unreasonable.[21] Thus, there are two basic questions involved in resolving questions of qualified immunity: first, taken in the light most favorable to the plaintiff, do the facts show that the public official's conduct violated a constitutional

---

[16] *Cole v. Carson*, 935 F.3d 444, 452 (5th Cir. 2019), as revised (Aug. 21, 2019).
[17] *Vasquez*, 961 F.3d at 727 (quoting *Thompson v. Upshur County.*, 245 F.3d 447, 456 (5th Cir. 2001)).
[18] *Cunningham*, 983 F.3d at 190 (citing *Vasquez*, 961 F.3d at 727).
[19] *Winfrey v. Rogers*, 901 F.3d 483, 495 (5th Cir. 2018).
[20] *Pearson v. Callahan*, 555 U.S. 223, 237 (2009).
[21] *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011); *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

right; and second, was the right clearly established in light of the specific context of the case and at the time of the defendant's conduct?[22] Courts have discretion in deciding which of the two prongs will be addressed first.[23]

"The 'clearly established' prong is difficult to satisfy."[24] The phrase "clearly established" means that, at the time of the official's conduct, the contours of the law are sufficiently clear that every reasonable official would understand that what he is doing is unlawful.[25] The "clearly established" standard also requires that the legal principle clearly prohibit the official's conduct in the particular circumstances before him.[26] "The dispositive question is whether the violative nature of the *particular* conduct is clearly established."[27]

"Critically, courts must not define clearly established law at a high level of generality; rather, we must undertake the inquiry in light of the specific context of the case."[28] The court must define the right "with specificity."[29] In other words, "there must be adequate authority at a sufficiently high level of specificity to put a

[22] *Scott v. Harris*, 550 U.S. 372, 377 (2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).
[23] *Pearson*, 555 U.S. at 236.
[24] *Castloo*, 983 F.3d at 191.
[25] *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).
[26] *See Wesby*, 583 U.S. at 63.
[27] *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotation marks omitted).
[28] *Edmiston v. Borrego*, 75 F.4th 551, 559 (5th Cir. 2023) (cleaned up); *Ashcroft*, 563 U.S. at 742 (noting the Supreme Court "repeatedly" has told courts "not to define clearly established law at a high level of generality.").
[29] *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019).

reasonable official on notice that his conduct is definitively unlawful."[30] The specificity of the rule is "especially important in the Fourth Amendment context."[31]

Qualified immunity applies "when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[32] The question is whether a reasonable officer could have believed that the actions of the defendant were lawful in light of clearly established law and the information the officer possessed at the time.[33] "A right is 'clearly established' only if it 'is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"[34] If reasonable officers could differ on the lawfulness of a defendant's actions, the defendant is entitled to qualified immunity.[35] This demanding standard means that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."[36]

"For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing

[30] *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015).
[31] *Wesby*, 583 U.S. at 64.
[32] *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (quoting *Mullenix*, 577 U.S. at 11).
[33] *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).
[34] *Castloo*, 983 F.3d at 191.
[35] *Malley v. Briggs*, 475 U.S. 335, 341 (1986).
[36] *Id.*; *see also Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985) (explaining officials are immune unless "the law clearly proscribed the actions" they allegedly took).

violates federal law *in the circumstances*."[37] Consequently, to deny qualified immunity "existing precedent must have placed the statutory or constitutional question *beyond debate*."[38]

**3. Fourth Amendment Claims.**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[39] "Because arrests are seizures of persons, they must be reasonable under the circumstances."[40]

"The constitutional claim of false arrest requires a showing of no probable cause."[41] "Probable cause is not a high bar."[42] Probable cause requires "a probability or substantial chance of criminal activity, not an actual showing of such activity."[43] "[C]ourts must look to the totality of the circumstances and decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer[,] demonstrate a probability or substantial chance of criminal activity."[44]

---

[37] *Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997).
[38] *Morgan*, 659 F.3d at 371.
[39] U.S. CONST. amend. IV.
[40] *Wesby*, 583 U.S. at 56.
[41] *Club Retro, LLC v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009).
[42] *Wesby*, 583 U.S. at 57 (internal quotation marks omitted).
[43] *Winfrey*, 901 F.3d at 495.
[44] *Terwilliger v. Reyna*, 4 F.4th 270, 282 (5th Cir. 2021).

The independent intermediary doctrine shields reasonable probable cause mistakes, where an independent intermediary's decision, such as a magistrate issuing a warrant, breaks the chain of causation from an officer's probable cause mistake.[45]

In *Franks v. Delaware*, the Supreme Court determined that a criminal defendant has a right to challenge the truthfulness of factual statements made in an officer's arrest warrant affidavit via a veracity hearing in the criminal proceedings.[46] Specifically, if the defendant makes a substantial preliminary showing that the warrant affidavit on which the independent intermediary relied (1) contains false statements or material omissions that (2) were necessary to the finding of probable cause and that (3) were made knowingly, intentionally, or with at least reckless disregard for the truth, the criminal defendant is entitled to a veracity hearing, and may ultimately be protected from the fruits of that affidavit.[47] Thus, *Franks* has been described as providing an exception to the independent intermediary doctrine. The *Franks* holding, however, did not establish that an officer may be civilly liable when such a showing is made.

In this case, Culley asserts a so-called *Franks* claim. Culley does not allege that she ever tried to avail herself of a veracity hearing, nor that she otherwise challenged the arrest warrant affidavit in her criminal proceedings, but only asserts

---

[45] *Villarreal v. City of Laredo*, 94 F.4th 374, 393 (5th Cir. 2024) (en banc).
[46] *Franks v. Delaware*, 438 U.S. 154, 155 (1978).
[47] *Id.* at 155–56.

that her criminal prosecution was dismissed after it was not timely pursued. *See supra* at p.15.

**4. To determine whether a right was clearly established, the Court must evaluate whether the alleged conduct was proscribed by "clearly established law" at the time of the incident**

"Qualified immunity shields an officer from a suit unless that officer had fair notice that h[is] conduct was unlawful."[48] Qualified immunity operates to ensure that before officers are subjected to civil lawsuits, the officers are on notice their conduct is unlawful.[49]

To determine whether a right was clearly established, it must be determined whether the officer's alleged conduct was proscribed by clearly established law at the time of the incident.[50] "Fair notice requires clearly established law,"[51] meaning "that, at the time of the officer's [alleged] conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."[52] The rule must be settled, meaning it is dictated by controlling authority or a robust consensus of cases of persuasive authority.[53] To show the law is clearly established,

---

[48] *Nerio v. Evans*, 974 F.3d 571, 574 (5th Cir. 2020) (internal quotation marks omitted).
[49] *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).
[50] *Ashcroft*, 563 U.S. at 735.
[51] *Nerio*, 974 F.3d at 575.
[52] *Wesby*, 583 U.S. at 63.
[53] *Id.*

a plaintiff must "identify a case where an officer acting under similar circumstances…was *held to have violated* the Fourth Amendment."[54]

**B. <u>The District Court Erred by Finding Lyde's Conduct Was Objectively Unreasonable Under Clearly Established Law.</u>**

Lyde is entitled to qualified immunity because his alleged conduct was not objectively unreasonable under the clearly established law at the time.

As a preliminary matter, the District Court's underlying consideration of the objective-reasonableness issue mistakenly questions whether a fact-question for the jury exists instead of ruling on objective reasonableness as a matter of law. The District Court explains its rationale as follows:

> Thus, under Culley's version of events, a reasonable jury could find that Lyde and Nash's conduct was not objectively reasonable in light of clearly established law at the time. Stated differently, it would have been apparent to a reasonable officer when such conduct was undertaken that omitting material facts in an arrest affidavit would violate the Fourth Amendment.

ROA.1387.

However, the inquiry under the objective-reasonableness prong of Qualified Immunity is not a fact question for the jury. Even if genuine disputes of material fact exist concerning a Fourth Amendment violation, an officer is entitled to qualified immunity unless his actions were objectively unreasonably in light of clearly

[54] *Id.* at 64.

established law at the time of the alleged conduct.[55] The correct inquiry is objective unreasonableness as a matter of law.[56]

### 1. The Supreme Court's holding in *Franks v. Delaware* is limited to the criminal context and did not clearly establish a civil cause of action

*Franks v. Delaware* presented "an important and longstanding issue of Fourth Amendment law. Does a defendant in a criminal proceeding, ever have the right…to challenge the truthfulness of factual statements made in an affidavit supporting [a] [search] warrant[.]"[57] According to *Franks*, the accused could challenge the veracity of the arrest warrant affidavit used in a criminal proceeding. The Court held that a criminal defendant has a right to an evidentiary hearing challenging the veracity of a search warrant affidavit if the defendant meets his burden to make a substantial showing that: (1) the search warrant affidavit contains deliberate falsehoods or statements made "with reckless disregard for the truth"; and (2) the affidavit does not support a finding of probable cause without such falsehoods or statements.[58] A criminal defendant who makes that preliminary showing is entitled to a hearing, in which he bears burden of proving perjury or reckless disregard <u>and</u> a lack of probable

---

[55] *Roque v. Harvel*, 993 F.3d 325, 334 (5th Cir. 2021).
[56] *See id.*
[57] *Franks*, 438 U.S. at 155.
[58] *Id.* 171–72.

cause.[59] If he carries his burden, the fruits of the improperly issued search warrant are excluded from the criminal trial.[60]

Thus, *Franks* established a right and a remedy that are exclusive to criminal proceedings. The criminal defendant has a right to petition for a veracity hearing in the criminal proceedings and then, if successful at the hearing, the right to exclude the fruits of the improperly issued search warrant from use in the criminal trial. *Franks* did not establish a civil cause of action. To the contrary, the Court noted the "deep skepticism of Members of this Court as to the wisdom of extending the exclusionary rule to collateral areas, such as civil or grand jury proceedings."[61] The Court emphasized that "…the rule announced [in *Franks*] has a limited scope, both in regard to when exclusion of seized evidence is mandated, and when a hearing on the allegations of misstatements must be accorded."[62]

It is clear that the Supreme Court's decision in *Franks* did not clearly establish that a criminal defendant has a right to a civil cause of action against an affiant officer nor did it intend for *Franks* to be expanded as such.[63] Rather, *Franks* indicated that the veracity hearing standard it was imposing should not result in "any

---

[59] *Id.* at 155–56.
[60] *See id.* at 156.
[61] *Id.* at 171.
[62] *Id.* at 167; *see also id.* at 165–67 (explaining the limited scope arose in part due to substantial competing values).
[63] *See id.* at 167; *see also Melton*, 875 F.3d at 262–63 (noting the Supreme Court in *Franks* counsels against adopting a broader rule of officer liability sua sponte).

new large-scale commitment of judicial resources," and expressly stated that its rule should remain narrow based on six express concerns.[64] Indeed, in his dissent in *Franks*, Justice Rehnquist explicitly cautioned that though the Court surrounded the holding with numerous limitations, "My fear, and I do not think it an unjustified one, is that these limitations will quickly be subverted in actual practice."[65]

Furthermore, no subsequent Supreme Court opinion has expanded *Franks* to include a civil cause of action, nor has the Court issued any opinions arising from the appeal of a presumed civil cause of action based on *Franks*.[66] Rather, the Supreme Court has maintained that "suppression" of evidence in the criminal case is the appropriate remedy if the magistrate issuing a warrant was misled by knowingly false information in an affidavit.[67]

In addition, the Supreme Court has "not yet decided what precedents—other than our own—qualify as controlling authority for purposes of qualified immunity."[68] The Court has not explicitly held that circuit court authority may

---

[64] *Franks*, 438 U.S. at 170; *see also Melton*, 875 F.3d at262–63 (listing the six bases from *Franks* for keeping the decision narrow).

[65] *Franks*, 438 U.S. at 187 ("I greatly fear that this generalized language will afford insufficient protection against the natural tendency of ingenious lawyers charged with representing their client's cause to ceaselessly undermine the limitations which the Court has placed on impeachment of the affidavit offered in support of a search warrant.").

[66] To date, the Supreme Court has issued eighteen opinions mentioning *Franks*, the last being a brief mention in Justice Sotomayor's dissent in *Fernandez v. California*, 571 U.S. 292, 315 (2014).

[67] *United States v. Leon*, 468 U.S. 897, 923 (1984) (citing *Franks*, 438 U.S. 154).

[68] *Wesby*, 583 U.S. at n.8; *See e.g., Reichle v. Howards*, 566 U.S. 658, 665–66 (2012) (reserving the question of whether courts of appeals decisions can be a "dispositive source of clearly established law").

clearly establish the law, and instead, it has merely "[a]ssume[d] without deciding that a court of appeals decision may constitute clearly established law for the purposes of qualified immunity."[69] Relatedly, the Supreme Court's "citation to and discussion of various lower court precedents should not be construed as agreeing or disagreeing with them, or endorsing a particular reading of them."[70] At least one Fifth Circuit Judge insists that "the on-point case must be a *Supreme Court* decision issued before the alleged misconduct," because "[t]he Supreme Court has never held that circuit precedent can clearly establish law."[71]

Neither *Franks* nor any subsequent Supreme Court opinion has clearly established that a criminal defendant has a civil cause of action for a so-called *Franks* violation. Moreover, neither *Franks* nor any other Supreme Court opinion has clearly established that a criminal defendant has a civil cause of action against an officer in Lyde's circumstances as defined by the District Court's interpretation of Culley's version of events. Therefore, Culley's claim against Lyde should be dismissed based on Lyde's entitlement to qualified immunity.

---

[69] *Emmons*, 586 U.S. at 43.

[70] *Wesby*, 583 U.S. at n.8.

[71] *McMurry v. Brunner*, No. 21-50888, 2022 WL 17493708, at *7 (5th Cir. Dec. 7, 2022) (Oldham, J. concurring) ("Until they do, I would not rely on circuit precedent to deny qualified immunity."); *See Wesby*, 533 U.S. at 66 n.8 ("We have not yet decided what precedents—other than our own—qualify as controlling authority for the purposes of qualified immunity."); *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam) ("assuming that Circuit precedent can clearly establish law for purposes of § 1983"); *Nerio*, 974 F.3d at 576 n.2 ("Although we know the Supreme Court's decisions can clearly establish the law, the Supreme Court has never held that our decisions can do the same.").

### 2. Under the Fifth Circuit's case law, it was not beyond debate that Lyde's conduct violated clearly established law.

Assuming, *arguendo*, that Fifth Circuit authority may be properly relied upon to provide that a violation was clearly established (so long as the Fifth Circuit "first looks to Supreme Court precedent and then to [its] own" circuit.)[72] The Fifth Circuit's authority existing at the time of this incident did not provide that Lyde's alleged conduct violated clearly established law.[73]

This circuit has held that *Franks* liability "addresses the distinct issue of false information in a warrant application."[74] Plaintiffs have been permitted to allege a § 1983 claim "against an officer who deliberately or recklessly provides false, material information for use in an affidavit in support of [a warrant]."[75] An officer may be liable under *Franks* only if that officer assisted in preparing, presenting, or signing a warrant application.[76] But if that officer did not present or sign the affidavit, liability may only attach if that officer helped prepare the complaint by providing information for use in it.[77]

---

[72] *Shumpert v. City of Tupelo*, 905 F.3d 310, 320 (5th Cir. 2018); *Bailey v. Iles*, 87 F.4th 275, 282 (5th Cir. 2023).
[73] *See Cole*, 935 F.3d at 451 (explaining an officer is entitled to qualified immunity if there is no violation or if the conduct did not violate law clearly established at the time).
[74] *Melton*, 875 F.3d at 264
[75] *Id.* at 262.
[76] *Id.* at 263.
[77] *Id.* at 264.

When discussing the clearly established law, here, the district court provided: "At the time of the incident, it was clearly established that filing—or pushing subordinates to file—false affidavits contrary to known exculpatory evidence violates clearly established law." ROA.1386.

However, at that time, it was not established "beyond debate" that every reasonable officer would know that "pushing subordinates" to file affidavits omitting allegedly exculpatory information violates a suspect's Fourth Amendment rights under a *Franks* theory. The information omitted in this case (i.e., DPS auditor Sims' February 8 email) was not exculpatory. *Infra* at pp.46-49. At the very least, it was not clearly established that the email was exculpatory.

In addition, the district court relied on this Court's recent decisions in *Terwilliger* and *Guerra* to deny Lyde's summary judgment motion for qualified immunity.

In *Terwilliger v. Reyna*, the Court held that the plaintiff pled "a plausible *Franks* claim against Defendants," including the District Attorney Reyna who did not create the affidavits.[78] In that case, 177 people were arrested using a form affidavit after a deadly shooting at a gathering of motorcycle clubs.[79] After the state failed to obtain convictions, multiple arrestees filed § 1983 lawsuits alleging *Franks*

---

[78] *See Terwilliger*, 4 F.4th at 284–85.
[79] *Id.* at 277–78.

liability against multiple defendants including Reyna.[80] Reyna asserted qualified immunity, which the district court denied.[81]

Reyna did not sign or swear to the affidavit, but the Court determined that *Franks* liability could attach only if Reyna provided material information for use in the arrest warrant affidavit.[82] Emphasis was placed on Reyna being provided with evidence that some bikers wearing colors should not be arrested, but acting contrary to that information, he stated that "all bikers wearing colors" should be arrested.[83] Because "Reyna knew the exact wording of the affidavit and knew or recklessly disregarded the fact that, based on the exculpatory evidence he had learned, probable cause did not exist to arrest some individuals potentially fitting the [arrest] warrant's criteria," the Court found those allegations were sufficient to tie Reyna to potential *Franks* liability.[84]

Shortly after *Terwilliger*, on September 7, 2023 the Fifth Circuit issued its opinion in *Guerra v. Castillo* holding "that *Terwilliger v. Reyna* controls here."[85] In that case, former patrol sergeant Guerra filed a § 1983 action against former chief of police Castillo alleging a scheme to have him fired and arrested on false charges.[86]

---

[80] *Id.* at 279.
[81] *Id.*
[82] *Id.* at 284.
[83] *Id.*
[84] *Id.* (internal quotation marks omitted).
[85] *Guerra v. Castillo*, 82 F.4th 278, 287 (5th Cir. 2023).
[86] *Id.* at 281–82.

After a subordinate officer arrested a suspect who was a strong political supporter of the city's mayor, the mayor urged Castillo to drop the charges. Guerra, however, refused to instruct his subordinate to drop the charges. This angered Castillo.[87] During that same time period, when Guerra found and playfully exchanged with another sergeant a pair of glasses a probation officer left behind, Castillo directed an investigator to find a way to get rid of Guerra—focusing on the glasses—despite being informed by the investigator that no crime had been committed.[88] Guerra was placed on administrative leave and later blackmailed by Castillo to resign or face termination and criminal prosecution.[89]

Applying *Terwilliger*, the Court found Castillo as the *sole moving force* behind *deliberate*, long-term conspiracy to create and file affidavits Castillo *knew to be false* with the purpose of exploiting the criminal justice system to arrest, detain, and torment Guerra for crimes Castillo knew he did not commit.[90] Castillo also ordered *sham investigations* that served as the bases for false affidavits and pushed the investigations forward despite *knowing* Guerra was innocent.[91]

[87] *Id.* at 282.
[88] *Id.*
[89] *Id.* 282–83.
[90] *Id.* at 286.
[91] *Id.* (emphasis added); *see also id.* at n.5 ("…Castillo certainly knew Guerra had not stolen the glasses or taken them from the evidence room, and he knew the investigations were shams, but he pushed his subordinates to continue forward regardless.").

**3. The District Court's Reliance on *Terwilliger* and *Guerra* is misplaced.**

Here, the district court's reliance on *Terwilliger* and *Guerra* was misplaced for multiple reasons.

First, based on the Supreme Court's holding in *Franks* and explicit instruction that the decision was to be kept narrow—as to not be expanded to permit a civil cause of action—*Terwilliger* and *Guerra* were wrongly decided and conflict with the Supreme Court's controlling precedent.

Second, *Terwilliger* is distinguishable. While Reyna was alleged to have known the exact wording of the affidaqit, here, there is no evidence that Lyde "knew the exact wording of the affidavit."[92] The only competent summary judgment evidence regarding whether Lyde knew what was in Nash's affidavit, are Lyde's and Nash's testimony confirming that Lyde did not participate in, or contribute to, the affidavit's creation, and did not see its contents. ROA.1071, 1077.

Third, the district court erred on an issue of material fact by assuming Sims' February 8 email was supposedly exculpatory when it was not, and by assuming, incorrectly and without reference to supporting evidence, that by inserting Sims' February 8 email into a corrected version of Nash's warrant affidavit, probable cause would be eliminated. ROA.1382-5. Rather, as fully set forth below, even if Nash

[92] *See Terwilliger*, 4 F.4th at 282.

included Sims' February 8 email in his affidavit, probable cause would still exist.[93] This does not rise to the level of *Terwilliger*, where Reyna allegedly knew that video evidence conclusively established that there was no probable cause for arresting some of the persons at the scene.

The district court also erred by relying on *Guerra*. To find a fact question that Lyde continued to participate in the investigation like the police chief in *Guerra*, the Court relied on (1) a February 11, 2021 email Lyde sent to the Wichita County Sheriff with a subject title of "Culley," stating in full, "How goes the war today?", and (2) that Lyde responded to a March 4, 2021 email from Sims asking why she (Sims) received a call from Nash, by telling Sims that Nash was calling because of a criminal investigation into Culley. ROA.1375, 1381-82. It is an unsupported, unreasonable inference[94] to say that these emails created a fact issue as to whether Lyde "participated" in the investigation as opposed to simply being aware of the investigation, and had knowledge of everything Nash learned in his independent investigation, especially in light of the uncontested summary judgment testimony of

[93] *See United States v. Tomblin*, 46 F.3d 1369, 1377 (5th Cir. 1995) (reckless exclusion of some exculpatory evidence from affidavit did not warrant suppression of evidence under *Franks* where the balance of the affidavit still established probable cause).

[94] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) ("[U]nsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment."); *Little v. Liquid Air Corp.*, 37 F. 3d 1069, 1075 (5th Cir. 1994) (providing "some metaphysical doubt as to the material facts by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence" does not satisfy the burden).

Lyde and Nash that conclusively confirm that Lyde did not participate. ROA.1070-71, 1076-79.

Indeed, for a criminal defendant to be entitled to a veracity hearing (let alone civil liability), the Supreme Court in *Franks* maintained that "a substantial preliminary showing" is required, and to even allow the evidentiary hearing (let alone to proceed on a civil liability claim), "the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine…Affidavits or sworn or otherwise reliable statements or witnesses should be furnished, or their absence satisfactorily explained."[95]

Further, in this case, Lyde initiated the investigation in January of 2021. The District Court concluded that Lyde allegedly knew that the investigation was a sham based on information from emails sent in February of 2021. Thus, unlike the police chief in *Guerra*, Lyde did not have knowledge of the alleged exculpatory information until after Nash's independent investigation was already underway. Lyde did not participate in Nash's investigation after it was started. ROA.1070-71, 1077-79. Even under *Guerra*, it was not clearly established that a supervisor can be liable for a *Franks* violation for his subordinate's warrant affidavit if that supervisor does not go out of his way to interfere with the subordinate's independent investigation to communicate allegedly exculpatory information learned after the

[95] *Franks*, 438 U.S. at 170.

independent investigation was already underway. *Franks* does not impose such a duty.

Even assuming, *arguendo*, that Sims' February 8 email was in some respect exculpatory (it was not), there is no competent summary judgment evidence to show that Lyde had knowledge whether Nash had learned of the February 8 email and included its information in his affidavit. And there is no competent summary judgment evidence to establish that Lyde knew that Nash did not still have probable cause even if he were to relay the email.

The facts of this case, taken in the light most favorable to Plaintiff, are still too dissimilar and distinguishable from the actions of the police chief in *Guerra*, such that *Guerra* could not have put Lyde on notice that his actions violated *Franks*.

Regardless, the *Terwilliger* decision was filed on July 8, 2021 and the *Guerra* decision was filed on September 7, 2023. Lyde's alleged conduct in this case occurred sometime between January through March, 2021, and Nash executed his affidavit on March 22, 2021. Because the *Terwilliger* and *Guerra* opinions were issued *after* the alleged conduct in this case, the law was not clearly established at the time. As such, the district court erred to rely on those two cases.

The law in this circuit that actually existed at the time of Lyde's alleged conduct does not place the issue beyond debate and truly compel that every officer

under the circumstances in Lyde's situation would have known his alleged conduct would constitute an actionable *Franks* violation.[96]

Thus, even taking all summary judgment facts in a light most favorable to the plaintiff, the Court must find that Lyde is entitled to qualified immunity under the "clearly established" prong.

### C. <u>The District Court Erred Regarding Its Materiality Determinations.</u>

The Fifth Circuit has stated that "Rule 56 means what it says" such that summary judgment must be granted where the record shows no genuine dispute of material fact.[97] Although the District Court was permitted to view the evidence in the light most favorable to the non-movant, any such reasonable inferences made must be based on facts established by the evidentiary record, as "[u]nsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment."[98] Further, "some metaphysical doubt as to the material facts by conclusory allegations,

---

[96] *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 578–79 (5th Cir. 2009); *See also e.g., Melton*, 875 F.3d at 262–63 (concluding an officer could be liable under *Franks* if he provided information for the purpose of it being included in a warrant application, but the officers in that case were dismissed for qualified immunity, and the Fifth Circuit explicitly declined to expand its *Franks* holdings); *Winfrey*, 901 F.3d at 494-96 (concluding that the plaintiff alleges a clearly established violation under *Franks* against the deputy that created and presented the affidavit that intentionally or recklessly included material omissions, but it does not speak to a *Franks* claim against an officer that was not the affiant, or how such an officer could be liable for reckless inclusion of material omissions in an affidavit the officer did not contribute to).

[97] *Liquid Air Corp.*, 37 F.3d at 1075 (citing Fed. R. Civ. P. 56(c)).

[98] *Galindo*, 754 F.2d at 1216 (internal quotation marks omitted).

by unsubstantiated assertions, or by only a scintilla of evidence" do not satisfy the burden of the non-movant to show that there is a genuine issue for trial.[99]

Here, the district court misconstrued the materiality of multiple facts when conducting the *Franks* corrected-affidavit analysis to determine whether probable cause still existed upon deleting the alleged false statements and material omissions.[100] It is undisputed that Nash's affidavit, on its face, establishes probable cause. This is evident by the fact that Culley pursues a *Franks* claim, and not a *Malley* claim.[101]

Probable cause requires "a probability or substantial chance of criminal activity, not an actual showing of such activity."[102] "Courts must look to the totality of the circumstances and decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer[,] demonstrate a probability or substantial chance of criminal activity."[103]

Even construing the summary judgment evidence in the light most favorable to the plaintiff, Sheriff Lyde is still entitled to qualified immunity.[104]

---

[99] *Liquid Air Corp.*, 37 F.3d at 1075.
[100] *See Spikes*, 141 F.4th at 667 (materiality of fact issues reviewed *de novo*); *Winfrey*, 901 F.3d at 495 (probable cause determinations reviewed *de novo*).
[101] *Blake v. Lambert*, 921 F.3d 215, 222 (5th Cir. 2019) (a warrant affidavit that facially lacks probable cause cannot trigger the *Franks* analysis); *see Malley*, 475 U.S. 335.
[102] *Winfrey*, 901 F.3d at 495.
[103] *Terwilliger*, 4 F.4th at 282.
[104] *Cole*, 935 F.3d at 452.

**1. The District Court Incorrectly Ignored the Material Fact that Nash and Lyde Had Learned that Eight to Twelve Computers Already Had Access To and Contained CJIS Data.**

The district court incorrectly ignored the material fact that Nash and Lyde learned that eight to twelve computers already had access to and contained CJIS data. In particular, Nash testified that "it was discovered that the previously submitted site maps for those audits did not accurately represent what was actually in place at the Clay County Sheriff's Office." Nash's affidavit statement was not false.

The district court failed to address the uncontested material fact that Nash had learned from other deputies and from Captain Evans that ten to twelve desktop computers at the CCSO had already been accessing CJIS data before Lyde's administration started.

Culley concedes that her 2016 and 2019 DPS network maps which she submitted to DPS only listed one computer with access to CJIS. ROA.528.

However, Nash and Lyde learned that, prior to Sheriff Lyde taking office, prior to making any software changes (such as adding COPsync and Kologic), and prior to adding new computers at the CCSO, the CCSO had eight to twelve computers that had access to or contained CJIS data. ROA.1069, 1075-78, 1119. Specifically, Nash testified that Captain Evans told Nash that Culley's 2016 and 2019 network site maps were inaccurate. ROA. 1117. Nash also testified that CCSO

deputies who were employed by CCSO in 2016 and 2019 informed him that *multiple* CCSO computers in 2016 and 2019 contained and were used to access to CJIS data. ROA.1117. Culley did not challenge or refute that Nash was thus informed by other deputies. Importantly and strangely, the District Court's decision did not address this uncontroverted fact.

Also, in January, Captain Evans sent an email to Culley, Lyde, and others indicating that "The issue, according to DPS, is that <u>our desktop computers are on the County network and the local server contains data obtained from TLETS</u>." ROA.1255 (emphasis added).

This email indicating that multiple CCSO desktop computer<u>**s**</u> and the local server contain CJIS protected data from TLETS corresponds with Nash's uncontroverted testimony that he learned that more than one computer inside CCSO had already been accessing and storing CJIS data obtained from TLETS before Lyde became Sheriff and before the transition. This was directly contrary to Culley's network maps which identified only one computer with such access. ROA.1250.

Thus, based on what Nash had learned, an objectively reasonable officer would understand that probable cause existed supporting the arrest warrant. [105] But while the standard for establishing probable cause is a low bar, the standard for

---

[105] *See Wesby*, 583 U.S. at 57 ("Probable cause is not a high bar.") (internal quotation marks omitted).

establishing arguable probable cause is even lower. Arguable probable cause is, after all, all that is required for Sheriff Lyde to be entitled to qualified immunity from Culley's Fourth Amendment claim.

Culley offers no competent summary judgment evidence to refute the fact that multiple computers had access to CJIS protected data, and she does not dispute that Nash learned this from Evans and other deputies. Culley and the district court ignored Nash's testimony which he learned from Evans and from other deputies (who were at the Sheriff's Office before Lyde took office) that multiple computers had, in fact, been accessing and storing CJIS data contrary to Culley's network maps.

The evidence Culley relies upon does not create a question of material fact, because it refers to changes to the network that were to take effect when the proposed software transition and addition of MDTs would occur, as opposed to confirming what computers had access to or contained CJIS-protected data in 2016 and 2019.

Specifically, Culley cites to her own Declaration, referring to a February 26, 2021 email from Sims. ROA.1257.[106] On its face, this email discusses what desktops will have access to CJIS-protected data in the future. It does not refute the fact that, before Sheriff Lyde became Sheriff, eight to twelve desktops had access to CJIS protected data.

---

[106] Sims's email indicates her mistaken understanding (the source of which was Culley) that the 12 computers do not yet, but will have, access in the future.

Culley also relies on the February 8, 2021 email from DPS auditor Sims. ROA.1274. As explained *infra*, DPS auditor Sims' February 8 email is no more than Sims repeating the false information she received from Culley's false network maps, that "per your agency" the other desktops did not have access to CJIS data.

Even assuming, *arguendo*, that Nash knew of the February 8 email, his not mentioning it in the affidavit was not a material omission because it could not possibly be exculpatory. A statement from Sims, the victim of Culley's lie, that repeats Culley's lie is not exculpatory, but rather confirms that the lie occurred. Thus, inclusion of the email in Nash's arrest warrant affidavit would not have negated probable cause. Culley's evidence does not create a material question of fact regarding Nash's reasonable belief that probable cause existed to arrest Culley.

This uncontroverted fact that the district court overlooked is material as to whether Nash had probable cause, and, therefore, is material to Nash and Lyde's entitlement to qualified immunity.

**2. The District Court Erred by Concluding that Nash Had Knowledge of Sims' February 8 Email Based on No Facts, but only an Unreasonable, Unsupported Inference.**

The district court erred by concluding that Nash had knowledge of Sims' February 8, 2021 email because it is based only on an unreasonable and unsupported inference.

In its Order, the District Court improperly imputes to Nash knowledge of allegedly exculpatory information contained in DPS auditor Sims' February 8 email despite there being no facts in the record reflecting that Nash had ever seen it, been informed of its contents, or received it. This improperly imputed knowledge is used as the sole reasoning in the district court's analysis for denying summary judgment on every legal issue discussed in the Order.

The district court, however, does not conclude that Nash had such knowledge based on the record because there is no evidence in the record establishing that such information was ever communicated to him. In fact, the District Court acknowledged: (1) the February 8, 2021 email was not sent Nash, (2) no documents have been produced showing that Nash had any knowledge of the information in that email, (3) no communications have been identified in which that information was shared with Nash, (4) Lyde testified that he did not provide Nash with any documents or information for use in the warrant affidavit, which would include the email—and denied assisting with the investigation, and (5) Nash denied knowing about the email and its contents in his own sworn declaration.[107]

The district court's imputation of knowledge to Nash is based solely on an bizarre, unreasonable inference that Sims' February 8 email explained the end-of-

[107] ROA.1108–09, 1130–32 (Interrog. Nos 3–9, 12); ROA.1117, ¶ 11; ROA.1324, ¶¶ 16–17, 20–22; ROA.1382–83.

life issue, and that Nash's Affidavit contained "unnatural language" because it "avoided mentioning end-of-life equipment directly." ROA.1382.

On its face, however, Sims' February 8 email does not mention end-of-life equipment. *See* ROA.1274. The District Court cites no other basis for concluding that Nash had knowledge of the February 8 email and its contents when the warrant affidavit was written. It was impermissible under Rule 56 for the District Court to impute to Nash knowledge of the contents of the February 8 email on Nash based on the above reasoning because it is an incorrect, conclusory assertion based on speculation and inferences with no evidentiary basis in the record to support it.[108] The assertion that Nash had knowledge of the contents of the February 8 email relies on unsupported inferences because even when considering all evidence available in the light most favorable to Culley, there is no conversation, communication, date, or time that can be pointed to within the record which would establish that any of the information from the February 8 email was ever shared with Nash.

No evidence in the record supports a single fact which could be used to support an inference that Nash had knowledge of the contents of the February 8 email.

[108] *Favela v. Collier*, 91 F.4th 1210, 1213 (5th Cir. 2011) ("An assertion is conclusory if it relies on inferences without also setting forth the facts that support those inferences.").

### 3. The District Court Misconstrued the Materiality of Nash's Affidavit's silence regarding Sims' February 8, 2021 Email, Because Sims Lacked Knowledge of the 8 to 10 Computers Accessing CJIS Data Which Culley Left Off of the 2019 Network Map.

The District Court improperly placed an undue legal significance on Nash's affidavit's silence regarding Sims' February 8, 2021 email. Even assuming, *arguendo*, that Nash had been informed of Sims' February 8 email and its contents (he was not), its inclusion in Nash's arrest warrant affidavit would not have negated probable cause. Nor was it clearly required to be included under *Franks*.[109]

Nash's omission of any discussion of the email or its contents was not a material omission. The premise of Culley's arrest was that she falsified and submitted false network maps to DPS. In essence, Culley was suspected of concealing from DPS auditor Sims the truth that in 2016 and 2019, multiple computers were accessing CJIS data, not just the one that Culley identified on her network maps.

Sims' February 8, 2021 email states in relevant part:

> I would like to go on record and say that I was asked how did the agency past their previous audit. This is in reference to the 10 or 12 desktops that were not on the previous network diagram. The 10 or 12 desktops were never discuss [sic] in the previous audits **<u>because I was informed that they did not have access to CJI data</u>**.
> …

[109] *See e.g.*, *Tomblin*, 46 F.3d at 1377 (reckless exclusion of some exculpatory evidence from affidavit did not warrant suppression of evidence under *Franks* where the balance of the affidavit still established probable cause).

> I have attached a copy of the agency's 2016 and 2019 CJIS Technical Audits. Please see the agency's answers that addresses the statements about the JIMS. If the 10 or 12 desktops do not have access to TLETS computer or the JIMS then they would not have been added to the network diagram.[110]
> The reason why the 10 or 12 desktops must be included on the **current** diagram is because the agency is going to have CJI data on the PD network. The 10 or 12 desktops **are going to have access** to the Kologik CAD/RMS/JMS. The 10 or 12 desktops **will be used** to access, process or store CJI data into those system.
> …
> Those desktops were not include [sic] on the diagrams before because they did not have access to CJI data **per your agency**.

ROA.1274 (emphasis added). Culley's insistence that the network maps would need to be redone because software would be installed *in the future* does not create a question of material fact as to the discovery that multiple CCSO desktop computers were accessing CJIS protected data in the past (2016 and 2019). Likewise, Sims's email simply confirms that she "was informed" by Culley that the 10 or 12 desktops did not access CJIS data. This does not create a question of material fact, because it simply confirms that Sims "was informed" "per your agency" (Culley) of incorrect information via Culley's 2016 and 2019 network maps. Sims presumes that the 10 to 12 desktops "are going to have access," but has no knowledge other than what Culley's network maps indicated about whether or not they already had access.

[110] Sims confirms that her understanding of the network is based on information that was provided to DPS by "the agency," (CCSO), i.e., Culley's network maps.

Culley's arrest was for creating and submitting a false network map to the State of Texas's DPS auditor Sims in 2019. Culley lied to Sims (the State), by submitting her false network map in 2019 which indicated that only one computer had access to CJIS data at those times, when, in reality, eight to twelve computers had access at those times. Sims' email did no more than effectively restate the false information she was given by Culley's network maps.

Even assuming, *arguendo*, that Nash did learn of the February 8 email, his not mentioning it in the affidavit was not a material omission because it could not possibly be exculpatory. A statement from Sims, the victim of Culley's lie, that repeats Culley's lie is not exculpatory, but rather confirms that the lie occurred. Thus, even if Nash included the February 8 email in its entirety in his March 22 warrant affidavit, it would not have negated probable cause that Culley's 2019 network map was false, in violation of Tex. Penal Code § 37.10.

Moreover, the reason that District Court says this email is exculpatory does not make sense. As explained *supra,* the District Court's opinion erroneously concluded that the February 8 email was exculpatory because it "explain[ed] the end-of-life equipment issue to Lyde;" [ROA.1382] however the February 8 email did not discuss end-of-life equipment at all.

Regardless, it is not clearly established that a warrant affidavit must include all possible information that might be exculpatory. "Omitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing."[111]

**4. The District Court Incorrectly Ignored Nash's Belief that Culley Excluded Wichita County "End of Life" Computers from 2019 Network Diagram.**

The District Court's Order erroneously ignored the material fact that Nash had discovered that Culley used "end of life" computers[112] from Wichita County at the CCSO prior to Lyde becoming Sheriff, and that she did not identify these "end of life" computers on her 2019 network diagram.

A violation of Texas Penal Code §37.10 (Tampering with Government Record) may be found if a person "knowingly makes a false entry in, or false alteration of, a governmental record" or "makes, presents or uses any record, document, or thing with knowledge of its falsity and with intent that it be taken as a genuine governmental record[.]" Tex. Pen. Code §37.10(a)(1)-(2).

Sims confirmed to Nash that if an agency used "end of life" computers, it would not pass CJIS requirements. "Sims stated that submitting a network diagram which contained 'end of life equipment' would cause an agency not to pass the

[111] *See e.g.*, *Tomblin*, 46 F.3d at 1377 (reckless exclusion of some exculpatory evidence from affidavit did not warrant suppression of evidence under *Franks* where the balance of the affidavit still established probable cause).

[112] An end-of-life computer is a device no longer supported or updated by the manufacturer, which means that it does not receive security updates from the manufacturer.

audit." ROA.1076. Nash testified that "Sims stated that a reason someone could intentionally leave these "end of life" items off of the map is due to the fact that they would know they would not pass the audit if they were listed." ROA.1076. It is undisputed that Culley did not identify the end-of-life equipment on the network maps which she submitted. ROA.1264, ¶62.

In response, Culley argues an irrelevant point, that "it was a material omission to leave out that Ashley did not leave 'end of life' equipment on the diagram" from Nash's arrest warrant affidavit, because it misleads the Judge into thinking Culley left "end of life" equipment **on** the diagram. *See* ROA.607. This argument inverts the issue. The concern was that Culley left "end of life" equipment **off** the 2019 network site map to avoid failing the audit.

It is undisputed that during his investigation, Nash learned that "end of life" computers from Wichita County, Culley's other employer, were being used at the CCSO. ROA. 1106. When CCSO users started the server, the Wichita County seal would appear on computer screens. ROA.1072. Wichita County even came to the CCSO and took back all of the property Culley misappropriated. ROA.1072. If these "end of life" computers which were on the network had been included on Culley's 2019 network diagram, according to Sims, the CCSO would not have passed the DPS audit. ROA.1078 As a result, Nash had probable cause to believe Culley

intentionally left existing “end of life” computers off the diagram in order to pass the audit.[113]

The District Court incorrectly concluded that it was material that Nash’s warrant affidavit “was crafted to avoid directly stating a falsehood: that end-of-life equipment was left off the 2016 or 2019 diagrams.” ROA.1385. This was not a falsehood. End-of-life equipment was in use at the CCSO, but Culley left them off her 2016 and 2019 network diagrams. Culley’s decision to leave them off her network diagrams supports Nash’s reasonable probable cause belief that Culley thereby knowingly made a false entry on those governmental records in violation of Texas Penal Code §37.10.

However, even assuming, *arguendo*, that that portion of Nash’s affidavit was false, a corrected version of the affidavit regarding the use of “end of life” equipment would not create a material fact issue for probable cause. A magistrate would not have needed the existence of “end of life” equipment to find probable cause that the 2019 network site map intentionally omitted computers with access to CJIS data in violation of Texas Penal Code § 37.10.

[113] Culley has not shown that any court has found that she did not use “end of life” equipment at the Sheriff’s Office.

### 5. The District Court's Finding of a Factual Dispute Regarding "Motive" Was Not Material.

In denying summary judgment, the District Court concluded that a reasonable jury could infer that Lyde had animosity toward Culley "that could motivate Lyde to act against Culley," because there is a factual dispute over Lyde and Culley's characterizations of their interactions. ROA.1380.

While Lyde disputes having animosity, this is not a question of material fact. Whether or not probable cause to arrest exists does not turn on the officer's subjective intent. Rather, the Supreme Court has repeatedly and emphatically held that the probable cause analysis is purely objective.[114]

Additionally, while *Franks* considers whether a false statement in a warrant affidavit was made knowingly and intentionally, an officer's broader motive for seeking a warrant, such as personal animus, is irrelevant.[115] There is no such motive element to a *Franks* claim; and neither Culley nor the district court identified existing, controlling precedent holding that the officer's underlying personal animus or "motive" was a material fact.

---

[114] *Nieves v. Bartlett*, 587 U.S. 391, 403 (2019) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153, 155 (2004)) ("A particular officer's state of mind is simply 'irrelevant,' and it provides 'no basis for invalidating an arrest.'").

[115] *See e.g., United States v. Wilson*, 273 Fed. Appx. 356, 356–57 (5th Cir. 2008) (concluding because criminal defendant did not make a preliminary showing that the warrant affidavit was deliberately false or made in reckless disregard of the truth, defendant was not entitled to a *Franks* hearing).

Therefore, the district court erred to the extent it denied summary judgment based on a supposed fact question regarding the immaterial issue of motive.

**6. The District Court erroneously concluded that a jury could find that the investigation was fraudulent based on the immaterial fact that there was a change in network maps.**

The District Court erroneously concluded that a jury could find that the investigation was fraudulent based on the immaterial fact that there was a change in network maps. ROA.1381.

As explained above, Culley's offense did not involve a change in the network maps. Rather, her offense was based on submitting network maps in 2016 and 2019 which showed that only one computer in the CCSO accessed CJIS data, when, in actuality, eight to ten computers were accessing CJIS data at those times.

Thus, upon *de novo* review, this Court should conclude that there is no genuine issue of material fact sufficient to deny Lyde qualified immunity, as Culley fails to meet her burden of establishing that his actions were objectively unreasonable, such that all reasonable officers in his place and under the circumstances would have known that their actions constituted a Fourth Amendment violation for which they could be held civilly liable under *Franks* pursuant to clearly established law that existed at the time.

## CONCLUSION

Appellant Jeff Lyde respectfully prays that this Court: (1) reverse the District Court's order denying his qualified immunity Motion for Summary Judgment as to Plaintiff-Appellee's *Franks* claim, (2) render judgment in his favor granting him qualified immunity, and (3) award any other relief to which Lyde may be justly entitled.

Respectfully submitted,

*/s/ Thomas P. Brandt*

**Thomas P. Brandt**
State Bar No. 02883500
tbrandt@fhmbk.com
**John D. Husted**
State Bar No. 24059988
jhusted@fhmbk.com
THOMPSON, COE, COUSINS & IRONS, L.L.P.
700 North Pearl Street, 25th Floor
Dallas, Texas 75201
Telephone: 214-871-8200
Fax: 214-871-8209

Counsel for Defendant-Appellant Jeff Lyde

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the Court's ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on April 30, 2026 on all registered counsel of record, and has been transmitted to the Clerk of the Court.

*/s/ Thomas P. Brandt*
**Thomas P. Brandt**
Counsel of Record for
Defendant-Appellant Jeff Lyde

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

I certify that (1) this document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because it contains 10,800 words, excluding the parts exempted by rule and (2) this document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman with 12-point for footnotes.

*/s/ Thomas P. Brandt*
**Thomas P. Brandt**
Counsel of Record for
for Defendant-Appellant Jeff Lyde

**15480.007/26124676**